# IN THE COURT OF APPEALS OF IOWA

No. 21-0476
Filed January 12, 2022

**IN THE INTEREST OF W.N. and G.N.,**
**Minor Children,**

**C.B., Mother,**
    Appellant,

**R.N., Father,**
    Appellant,

**P.S. and K.S.,**
    Intervenors.

_____

Appeal from the Iowa District Court for Polk County, Kimberly Ayotte, District Associate Judge.

A mother and father separately appeal the termination of their parental rights to their children, and intervenors appeal an order on placement and guardianship. **AFFIRMED ON PARENTS' APPEALS; REVERSED AND REMANDED ON INTERVENORS' APPEAL.**

Cole Mayer of Macro & Kozlowski, L.L.P., West Des Moines, for appellant mother.

Jami J. Hagemeier of Hagemeier Law, P.L.C., Des Moines, for appellant father.

Andrea McGinn, Van Meter, for appellant intervenors.

Thomas J. Miller, Attorney General, and Natalie Deerr, Assistant Attorney General, for appellee State.

Kayla Stratton, Des Moines, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Tabor and May, JJ.

**VAITHESWARAN, Presiding Judge.**

The department of human services investigated allegations that parents of twenty-two- and ten-month-old children used methamphetamine while caring for them. The parents consented to the children's removal and placement with the children's maternal grandmother, and they did not contest their adjudication as children in need of assistance. The children remained in their grandmother's home throughout the proceedings under a dispositional order granting the grandmother and her husband[1] temporary legal custody, subject to department supervision.

The State eventually filed a petition to terminate parental rights. The grandparents moved to intervene during the termination hearing. They sought "continued placement of the children in their home." The district court granted their motion. The court reasoned that, "should the court terminate parental rights," the grandparents would "have no party to represent their position" on whether they were "suitable person[s]" to whom legal custody could be transferred. *See* Iowa Code § 232.102(1)(a)(1) (2020). The court scheduled a separate hearing on the placement question.

At that hearing, the grandparents asked the court to place the children with them as potential guardians or future adoptive parents. Following the hearings, the court terminated the parents' rights and filed an "order on placement and guardianship" denying the grandparents' request. The court ordered the children transferred to the custody and guardianship of the department for purposes of

---

[1] The parties referred to both as the children's grandparents. We will do the same.

adoption. The parents and grandparents appealed. The supreme court granted a stay of the placement/guardianship ruling pending appeal.

## I. Grounds for Termination

The parents contend the State failed to prove the grounds for termination cited by the district court. We may affirm if any of the grounds are supported by clear and convincing evidence. *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). We will focus on Iowa Code section 232.116(1)(h), which requires proof of several elements, including proof the children cannot be returned to parental custody.

The district court determined the "return" element was satisfied "due to both parents' unresolved substance use disorders, the parents' ongoing need for mental health services, the parents' need to address domestic violence in their continued relationship, and their need to demonstrate sustained sobriety." On our de novo review, we agree with the court's determination.

The children remained out of their parents' care for approximately fifteen months. Although the mother underwent substance-abuse treatment and abstained from methamphetamine use, she conceded she "relapsed" on alcohol as recently as a week before the termination hearing. She acknowledged she was not the person who could be present for the children twenty-four hours a day.

The department case manager recommended termination of the mother's parental rights, citing her failure to "follow through with any aftercare services," her "continued" consumption of alcohol, and her continued relationship with the father despite concerns of domestic violence. In a report to the court, she recommended the parents "address through mental health therapy how the presence of violence in their relationship impact[ed] the children."

The father also abused alcohol in violation of his probation agreement.  He was jailed approximately sixty days before the termination hearing.  His incarceration prevented him from being available to the children.  The case manager recommended termination of his parental rights.

We conclude neither parent could have the children returned to their custody at the time of the termination hearing as required by Iowa Code section 232.116(1)(h)(4).  The ground for termination was satisfied.

## II.     Best Interests

The parents contend termination was not in the children's best interests.  *See* Iowa Code § 232.116(2).  The mother notes that she "parented the children appropriately when she had visits" and she was not the subject of "parenting concerns."  The father asserts the "children would not suffer detriment if they were returned to him."

As discussed, neither parent could safely care for the children at the time of the termination hearing.  We conclude termination was in the children's best interests.

## III.     Exceptions to Termination

The parents contend the district court should have invoked exceptions to termination based on the district court's placement of the children's temporary custody with a relative and the closeness of the parent-child relationship.  *See id.* § 232.116(3)(a), (c).  These exceptions are permissive.  *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016).

The district court declined to apply either of the exceptions in light of "these children's young age, their need for a long-term secure placement, their trauma

history, and their emotional failure to thrive." On our de novo review, we find support for the court's conclusion, and we affirm the court's denial of the exceptions.

## IV. Six-Month Extension

The parents argue they should have been afforded a six-month extension to work toward reunification. *See* Iowa Code § 232.104(2)(b). The department case manager opined the parents could not realistically accomplish reunification in a six-month period. She noted that the father "minimally engaged in services" and, although the mother was more participatory, she and the father lacked "insight" into the effect of their decisions on the children. On our de novo review, we agree a six-month extension of time to work toward reunification was not warranted.

## V. Expert

The father contends the district court should have granted his motion for an expert witness to "do a complete home study of the grandparents' home." In denying the motion, the district court found the grandparents participated "in a home study through the licensing agency" with which the department had a contract and the grandmother also participated "in a psychological evaluation." The court concluded the proposed expert "would only serve to delay the court's [permanency] determination," which was "not in the children's best interests."

On our de novo review, we find the record unclear on whether the department completed a home study. Department reports contain references to a "home study process" that was to have been initiated by the grandmother in June

2020 through the same service provider considering her application to adopt the children. But if a home study report was generated, the report is not in our record.

That said, the existence of an established entity charged with conducting home studies supports the district court's decision to deny the father's request for an expert to provide the same service. As for the psychological evaluation of the grandmother, the department completed the evaluation, which is in our record and will be discussed in greater detail below. We conclude the district court did not abuse its discretion in denying the father's motion for an expert. *See In re S.D.*, 671 N.W.2d 522, 528 (Iowa Ct. App. 2003) (setting forth standard for reviewing motion to retain an expert).

## VI. *Removal from Grandparents—Placement/Guardianship*

Preliminarily, we address the standard of review for placement/guardianship decisions. The State argues the appropriate standard is for an abuse of discretion. We disagree.

The grandparents sought to intervene under the authority of Iowa Code chapter 232. They cited the permanency provision of Iowa Code section 232.104 and the relative exception contained in section 232.116(3).[2] There is no question that the placement decision fell under the purview of chapter 232. Accordingly, we conclude our review is not for an abuse of discretion but is de novo. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010) ("[T]he proper standard of review for all termination decisions should be de novo."). We turn to the merits.

---

[2] As will be discussed, we believe section 232.117(3) governs the decision.

Following termination of parental rights, Iowa Code chapter 232 authorizes a court to transfer guardianship and custody of a child to several persons or entities, including the department or "other relative [] or other suitable person." Iowa Code § 232.117(3)(c). The supreme court considered the provision in *In re A.S.*, 906 N.W.2d 467, 477 (Iowa 2018). There, the court rejected "the option of affirming termination of A.S.'s parental rights while remanding for transfer of the guardianship and custody of the child to a relative of the child." *A.S.*, 906 N.W.2d at 477. The court cited (1) the absence of a "statutory preference for placement with a relative," (2) the recommendation of "[b]oth the [department] and the guardian ad litem" to place "the child in the guardianship and legal custody of the [department] so that the child [could] be adopted," and (3) the principle that "a guardianship is not a legally preferable alternative to termination." *Id.*

The third ground on which the court relied in *A.S.* is the same ground cited by the district court in this case. Specifically, the court denied the grandparents' request "to be able to either adopt the children or have the children remain in their care by way of a guardianship" because "[t]ermination and adoption are the preferred methods of obtaining permanency for children who cannot be returned to a parental home," citing *In re B.T.*, 894 N.W.2d 29, 33–34 (Iowa Ct. App. 2017).

We have no quarrel with the focus on permanency and adoption. But, in our view, the grandparents' request to retain custody of the children advanced both goals. The grandmother testified that if the parents could not be "Mom and Dad," she was "going to be here to look after the babies." The State's attorney specifically asked her, "if the Court terminates [parental] rights and the [children] remain with you, are you committed to giving the [children] a forever home?" The

grandmother responded, "Yes, I am." The attorney then asked, "Would you be willing to adopt them?" She responded, "Yes." The grandmother testified she had investigated the process for getting licensed to adopt and already "sent [in] their fingerprints." In her words, "Everything's all done . . . . Everything's been sent off and we're waiting." The grandfather similarly testified he would "move Heaven and earth for" the children and he would do "[a]nything to keep the [children]." He expressed a desire to give them "some structure in their lives, some well-being, someplace that they [could] call permanent." He opined, "[I]t would make me very happy to adopt them." In short, the grandparents were willing to fulfill the twin goals of permanency and adoption. *Cf. A.S.*, 906 N.W.2d at 478 (noting grandparents did not testify).

The grandparents also had the ability to fulfill those goals. Their home was the only stable home the children knew. As the district court acknowledged, both children were attached to their grandparents and thrived in their care. The court found "[t]he children enjoy a loving relationship with" the grandparents—the younger child shared "a particularly close relationship with her grandfather" and the older child enjoyed "a close relationship with her grandmother." The court further found the children "made gains in their development and growth while in" the grandparents' home. And the court found the grandmother "participated in the children's therapy as expected."

Until shortly before the termination hearing, the department conceded as much. In a report filed three months before the termination hearing, the department characterized the placement as a "strength" and stated the children were "doing well in this placement." In contrast to the case manager's later

suggestion that the grandmother refused to enroll the older child in daycare and educational services, the report stated the decision to delay those services was made by a service provider who believed the older child could not be placed in daycare until she developed better communication skills.

Those skills improved in the grandmother's care. The department reported that the older child had enhanced "communication and behaviors" and reported that the grandmother agreed to have the child participate in Head Start. Finally, it was undisputed that, at the time of the termination hearing, the child was at the same level as her peers in all subjects except math.

A service provider who met with the grandparents at their home testified the children's basic needs, developmental needs, and medical needs were being met. She described the grandparents as "very interactive and nurturing towards the" children. She stated the bond between the younger child and the grandfather was strong and he was a "positive role model." She testified to the grandmother's ability to discern whether the children's mother and father were sober and stated, "that shows protective capacities." Although she conceded there had been strain between the grandmother and mother, she testified that, more recently, the two discussed "wanting to work as a team" for the sake of the children. She noted that they had "increased conversations," sometimes simply to chat. She opined "their relationship ha[d] definitely improved throughout this case." *Cf. In re W.M.*, 957 N.W.2d 305, 315 (Iowa 2021) (denying request for guardianship after concluding the mother and grandmother lacked a close, conflict-free relationship warranting creation of a guardianship); *A.S.*, 906 N.W.2d at 478 (noting "there was physical and verbal aggression in the grandparents' household"). When asked if the

children's parents and grandparents were the most important people in the children's lives, she responded, "Absolutely." She had no reservations with having the children remain in the care of their grandparents.

Another service provider who provided mental-health therapy to the children testified she worked with the older child to "utilize her secure relationships in order to know the boundaries for strangers." The secure relationships included "her grandparents." The provider also worked with the younger child "to provide an increased level of attunement between her caregivers and herself." She described the children's "adverse child experience" scores and stated none of the scores were attributable to the grandparents. She agreed that removing the children from their grandparents could have a lasting effect on their relationships into adulthood.

The person who conducted a psychosocial evaluation of the grandmother testified the grandmother "was pretty clear that she was fighting for her grandchildren, and that it was very important to her." She said the grandparents "together [were] trying to do what they c[ould] to provide the best for the children." While she characterized placement of the children with the grandmother as "risky," the concerns she enumerated were undercut by the grandmother's actions in the year preceding termination. The grandmother's age of fifty-five, for example, did not prevent her from serving as caretaker for these two children as well as the four children of another daughter. And the grandfather's health issues did not prevent him from working full-time to support the family and helping with the children. His full-time employment with retirement benefits should have alleviated the evaluator's concerns with the grandmother's "financial fragility." As for the grandparents' ability to keep up with the needs of the children, the grandmother

cared for them all day, took them to scheduled appointments, and facilitated services and visits within the home, facts acknowledged by the department throughout the proceedings. Finally, there was scant if any indication that the grandmother's pace of learning cited by the evaluator prevented her from understanding the children's needs or translated into safety concerns for the children. The example cited by the evaluator—the grandmother's failure to recognize the older child's anxiety when a stuffed animal she was playing with tipped over—is hardly indicative of sustained parenting deficiencies. Nor is the grandmother's initial reluctance to refer the child to another specialist—a referral the evaluator conceded the grandmother agreed to after the nature of the evaluation was explained. It is worth noting that the grandmother was keenly attuned to the older child's need for speech therapy and she facilitated services to address the need. As a result of the grandmother's attention, the length of the older child's sentences improved significantly over the placement period. As for the younger child, the evaluator conceded she "lit up like a Christmas tree" on seeing her grandfather. *Cf. A.S.*, 906 N.W.2d at 478 (noting the child "at age two [was] too young to express a preference").

We are left with the grandfather's criminal history. The grandfather testified he served three-and-a-half years in prison for second-degree sex abuse and second-degree burglary convictions arising out of crimes committed in 1979 when he was nineteen years old. The sex abuse charge arose from an attempted robbery of an adult woman. During the attempt, the grandfather incidentally touched and grabbed the fully clothed woman in a public place. The grandfather said he never saw the woman before and he was also fully clothed at the time.

The State did not dispute the father's rendition of the circumstances leading to the sex abuse charge.[3]  And, although the State resisted the grandparents' request to retain the children, as did the guardian ad litem, the department had no qualms about placing the children in the grandfather's home following the children's removal and expressed no concern with his treatment of the children or the grandmother.

The district court also discounted the conviction in the placement decision. The court explained that while "[a] forcible felony is a barrier to DHS or any private agency approving an adoptive home study . . . the court may waive any investigation and report required given that [the grandfather] is related within the fourth degree of consanguinity to the person to be adopted.  *See* Iowa Code § 600.8(12).[4]"  The court stated, "If [the grandfather's] 1979 conviction was the only issue present regarding the children's placement, the court may have considered that outcome."  Ultimately, the court declined to waive an investigation and report under section 600.8(12) because of the State's concerns with the grandmother's caretaking abilities.  As discussed, those concerns were overblown.

---

[3] The grandfather also testified to a 1994 simple misdemeanor domestic abuse conviction involving his former wife.  For purposes of placement, the district court focused on the felony sex abuse conviction.

[4] That provision states:

> Any investigation and report required under subsection 1 may be waived by the juvenile court or court if the adoption petitioner is related within the fourth degree of consanguinity to the person to be adopted.  However, if an adoption petitioner discloses a criminal conviction or deferred judgment for an offense other than a simple misdemeanor or founded child abuse report pursuant to section 600.5, the petitioner shall notify the court of the inclusion of this information in the petition prior to the final adoption hearing, and the court shall make a specific ruling regarding whether to waive any investigation or report required under subsection 1.

On our de novo review, we conclude the grandparents were the only stable influence in the children's lives and uprooting them at this critical juncture would result in another adverse childhood experience.

We reverse the placement/guardianship decision and remand for waiver of the placement investigation and report pursuant to Iowa Code section 600.8(12) and for consideration of the grandparents as adoptive parents or, alternatively, for appointment of the grandparents as guardians pursuant to Iowa Code section 232D.201(1). We recognize the creation of a guardianship will require the guardians to file annual reports that "shall not be waived by the court." *See id.* § 232D.501(1); *cf. A.S.*, 906 N.W.2d at 478 (citing the reporting requirement as grounds for denying grandparents' request for a guardianship). But, in our view, this is a small price to pay for the children's near and long-term stability.

**AFFIRMED ON PARENTS' APPEALS; REVERSED AND REMANDED ON INTERVENORS' APPEAL.**